IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

MARIA LEWIS,                                             Case No. 6:15-cv-00593-SB

               Plaintiff,                          **FINDINGS AND**
                                      **RECOMMENDATION**

     v.

CAROLYN W. COLVIN,
Commissioner of Social Security,

               Defendant.

_____

**BECKERMAN, Magistrate Judge.**

     Maria Lewis ("Lewis") appeals the Commissioner of Social Security's ("Commissioner")

denial of her applications for Social Security disability insurance benefits and Supplemental Security

Income under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-34, 1381-83f. The

Court has jurisdiction to hear this appeal pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). For the

reasons explained below, the district judge should reverse and remand this case for an award of

benefits.

Page 1 - FINDINGS AND RECOMMENDATION

## I. FACTS AND PROCEDURAL HISTORY

Lewis stands five-feet, two-inches tall and weighs approximately 215 pounds. She was born in August 1975, making her thirty-four years old on March 14, 2010, the amended alleged disability onset date. Lewis is a high school graduate, and her past relevant work includes time as a caregiver, fast food worker, shipping clerk, stock clerk, grocery clerk, and electronics assembler. Lewis alleges disability due primarily to back and left hip impairments, as well as carpal tunnel syndrome in both wrists.

On August 5, 2008, roughly a year and a half before the amended alleged disability onset date, Lewis underwent a microlumbar discectomy and microscopic decompression to relieve an impinged and displaced nerve root caused by a ruptured disc. Later that month, a magnetic resonance imaging ("MRI") test of the lumbar spine showed "enhancement within the thecal sac" of the nerve root, which was "suggestive of neuritis."[1] (Tr. 489.) When Lewis' back pain persisted, she underwent a second microlumbar discectomy, as well as a neurolysis of the right S1 nerve root, on December 26, 2008.[2]

On January 15, 2009, Lewis presented for a post-operative visit with Dr. Mark Belza ("Dr. Belza"), the surgeon who performed Lewis' back surgeries. Lewis informed Dr. Belza that she was ninety-nine percent "improved over her preoperative status," and wanted to return to work as a caregiver. (Tr. 497.) Dr. Belza released Lewis to eight hours of light duty work per day, noted that

---

[1] "'Neuritis' is defined as 'inflammation of a nerve, with pain and tenderness, anesthesia and paresthesias, paralysis, wasting and disappearance of the reflexes.'" *Pate v. Shinseki*, No. 11-3591, 2013 WL 3283350, at *1 n.2 (Vet. App. June 28, 2013) (citation omitted).

[2] Neurolysis is defined as the "release of a nerve sheath by cutting it longitudinally." *Dean v. Astrue*, No. 11-cv-4027, 2012 WL 965113, at *1 n.7 (N.D. Iowa Mar. 21, 2012) (citation omitted).

he would remove the work restrictions if Lewis continued to improve, and stated that he was "very pleased" with Lewis' "rapid recovery thus far, especially given the fact that she had a recurrence." (Tr. 497.)

On July 1, 2009, Lewis called Deschutes County Mental Health, complaining of anxiety. Lewis, who was "crying and sobbing" during the call, stated that she had recently contemplated suicide, but elected to call the police for assistance. (Tr. 715.) Mary Gardner, a medical student, counseled Lewis over the phone and discussed various coping skills employed by Lewis. Lewis listed several activities, including taking walks, breathing, and taking medications. Lewis added that she would try listening to music, cleaning the house, exercising, yoga, and going "to the thrift store." (Tr. 716.)

On September 23, 2009, Lewis attended group counseling with Marta Richards ("Richards"), a licensed professional counselor at Deschutes County Mental Health. Lewis reported that she was "a bit 'paranoid' about group but excited to be [t]here," had been "walking daily" and lost fifteen pounds, and planned to attend several Alcoholics Anonymous ("AA") meetings during the upcoming week. (Tr. 703.)

On October 22, 2009, the state's child welfare department referred Lewis for an evaluation with Elisabeth Huyck ("Huyck"), a qualified mental health professional. Before the evaluation, the state's child welfare department reported that Lewis had been unable to stop drinking alcohol, and that Lewis' recent urinalyses demonstrated that she had been using alcohol and benzodiazepines. Upon examination, Huyck determined that Lewis appeared "to meet the criteria for alcohol dependence, cannabis dependence, and amphetamine dependence . . . currently in remission." (Tr. 700.)

Page 3 - FINDINGS AND RECOMMENDATION

On November 13, 2009, Lewis was taken to the emergency room at the local hospital by the Bend Police Department, because she called 911 while intoxicated and stated that she was suicidal. Anne Muir ("Muir"), a qualified mental health professional, observed that Lewis' medical records included reports of childhood sexual abuse and a sister dying from cirrhosis of the liver.[3] Muir provisionally diagnosed Lewis with posttraumatic stress disorder, alcoholic intoxication, and alcohol dependence.

The following day, November 14, 2009, Dr. Gupreet Chopra ("Dr. Chopra"), a doctor at St. Charles Medical Center, concluded that Lewis did not pose a serious "risk of harming herself." (Tr. 880.) Dr. Chopra's diagnoses were: mood disorder not otherwise specified,[4] rule out a major depressive episode versus a substance-induced mood disorder (Axis I); complicated medical history (Axis III); moderate social stressors (Axis IV); and a Global Assessment of Functioning ("GAF") score of 60.[5]

On December 4, 2009, x-rays of Lewis' right wrist revealed "[m]oderately severe carpal tunnel syndrome of [the] right upper extremity." (Tr. 1012.) Dr. Michael Coe ("Dr. Coe") noted that

---

[3] The record indicates that Lewis was sexually abused by her biological father at the age of seven "and her stepfather then started to abuse her at age [eight] and . . . that continued until age [twenty-eight]." (Tr. 1049.)

[4] "When several core features of a particular diagnosis present themselves, but individual characteristics do not give rise to any one subcategory, a description of 'NOS,' meaning 'Not Otherwise Specified,' is given. A diagnosis followed by 'NOS' does not put the principal diagnosis in doubt." *Slaten v. Comm'r of Soc. Sec. Admin.*, No. 06–1660, 2008 WL 4192282, at *4 n.12 (D.N.J. Sept. 9, 2008).

[5] "A GAF score of 60 indicates moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." *Douglas v. Colvin*, No. 13-7782-VBF, 2014 WL 4829030, at *4 n.7 (C.D. Cal. Sept. 26, 2014) (citation, quotation marks, and brackets omitted).

Page 4 - FINDINGS AND RECOMMENDATION

electrodiagnostic studies were consistent with such findings, and recommended carpal tunnel release surgery.

On January 29, 2010, Lewis visited Dr. Viviane Ugalde ("Dr. Ugalde"), complaining of neck and shoulder pain. Dr. Ugalde noted that Lewis suffered an on-the-job injury in early September 2009, and recent MRIs showed a central protrusion at left L1-2, a mild bulge at L3-4, a left lateral protrusion with bilateral foraminal narrowing at L4-5, a right chronic protrusion narrowing the right foramen at L5-S1, facet arthropathy bilaterally at L4-5 and L5-S1, and multi-level central protrusions at C2 to C6-7. (Tr. 1004.) Dr. Ugalde encouraged Lewis to participate in physical therapy and released Lewis to "modified duty with lifting less than [ten] pounds combined with both hands." (Tr. 1005.)

During a therapy session on February 25, 2010, Lewis reported that she was "more stable than she has ever been," which she attributed to the effectiveness of her medications. (Tr. 568.) Don McFerran, a psychiatric mental health nurse practitioner at Deschutes County Mental Health, believed that Lewis' success was due to her participation in group therapy and stress management "skill building." (Tr. 568.)

On March 5, 2010, an x-ray of Lewis' left knee was within normal limits. However, Dr. Ugalde observed that Lewis' symptoms were "accelerating," likely as a result of Lewis' "anxiety and difficulties getting treatment" (Lewis did not receive a trial of cervical traction because physical therapy was never authorized, and authorization for carpal tunnel surgery had yet to be approved). (Tr. 997-98.)

On March 15, 2010, the day after the amended alleged onset date, Lewis participated in a telephone therapy session with Tess Migdol ("Migdol"), a licensed professional counselor at

Page 5 - FINDINGS AND RECOMMENDATION

Deschutes County Mental Health. Lewis informed Migdol that she had been clean and sober for 120 days, she was seeking worker's compensation benefits due to a recent on-the-job knee injury, and she was taking "two classes on-line and signing up for a [certified nursing assistant] class" the following day. (Tr. 647.)

On April 2, 2010, Dr. Ugalde ordered a computerized axial tomography ("CAT") scan of Lewis' hip, which showed "multiple fragments and acetabulum [that appeared] to be more chronic," as well as "some fracture lines . . . in the mid acetabulum." (Tr. 989.) Dr. Ugalde spoke with an orthopedist from her office, who believed that Lewis' injuries stemmed from her on-the-job injury in September 2009. Dr. Ugalde noted that Lewis would follow up with a specialist, was still waiting on authorization for physical therapy, and would receive a steroid injection and prescription for a manual wheelchair.

On April 14, 2010, Lewis was seen by Dr. Timothy Bollom ("Dr. Bollom"), an orthopedic surgeon from Dr. Ugalde's office. Dr. Bollom reviewed Lewis' CAT scans and agreed that there appeared to be "some loose bodies," but he found "no excessive step off of the acetabulum to suggest prior displaced acetabular fracture." (Tr. 988.) Dr. Bollom assessed a "[h]igh likelihood of left hip acetabular fracture with generation of osteochondral loose bodies likely coincide with [Lewis'] history, however [Lewis'] clinical course does not match her CT and examination findings." (Tr. 988.) Dr. Bollom ultimately recommended an intra-articular steroid injection and hip arthrogram. (Tr. 985, 988.)

Lewis attended an in-person session with Migdol on April 19, 2010. Lewis, who had recently attended therapy in a wheelchair and reported that she needed to move into a wheelchair-accessible apartment, provided Migdol with "examples of pleasant activities that she did during the past week,"

including "fishing with her son[.]" (Tr. 631, 634.) Migdol noted Lewis was making good progress. Lewis did not bring a wheelchair when she presented for a therapy session with Migdol on May 11, 2010; however, she stated that "it was a mistake" because she was experiencing pain and discomfort. (Tr. 622.)

On June 30, 2010, Lewis underwent a hip arthrogram and received an intra-articular steroid injection. When Lewis presented for a follow-up visit with Dr. Ugalde on July 22, 2010, Lewis reported "an increase in her walking abilities" (she could walk up to four blocks without needing to sit down due to left hip, groin, and knee pain), she continued to attend school, and she was not working because her employer was unable to accommodate her "clear[ance]" for sedentary work. (Tr. 969.)

On September 9, 2010, after an MRI showed "possible labral tearing and symptoms of occasional loose body like symptoms," Lewis underwent a diagnostic arthroscopy, chondroplasty, and debridement on her left hip. (Tr. 864.) The following month, on October 22, 2010, Lewis, who had recently discontinued the use of a wheelchair and been released to do light duty work activities, overdosed on methadone, a drug that had been prescribed to help treat the chronic pain in Lewis' hip. (Tr. 830, 955-56.)

During a follow-up visit on October 28, 2010, Dr. Bollom examined Lewis and concluded that her "pain behavior is far out of proportion to exam and hip arthroscopy findings." (Tr. 953.) Dr. Bollom added that Lewis was "continuing to make slow and steady improvement with physical therapy." (Tr. 954.) Dr. Bollom made similar observations on December 20, 2010, concluding that Lewis' reported level of pain seemed "out of proportion . . . to [his] gentle hip maneuvers today."

(Tr. 944.) Dr. Bollom ultimately recommended that Lewis be limited to "sedentary work only." (Tr. 945.)

On January 26, 2011, Lewis completed an adult function report, in support of her applications for benefits.[6] Lewis testified that her typical day consists of taking a hot bath and medications in the morning, preparing a meal for her children before school, sitting in her massage chair throughout the day, reading, watching television, attending physical therapy appointments three times a week, and playing cards with her friend four to five times per week. Lewis added that she suffers primarily from back and hip impairments, which negatively impact her ability to lift more than five to ten pounds, do the laundry, maintain her balance, sleep, sit, stand, or walk for extended periods of time, get dressed, shop without a motorized cart and someone to assist with lifting the groceries, balance, do yard work, squat, bend, reach, kneel, climb stairs, complete tasks, and use her hands. Lewis also stated that she is able to fold clothes, dust, wipe the countertops, wash dishes, and put dishes away in low cupboards.

On February 26, 2011, Lewis underwent carpal tunnel release surgery on her right wrist. (Tr. 1157.)

On May 10, 2011, Lewis was referred to Dr. William Trueblood ("Dr. Trueblood") for a psychodiagnostic examination. Based on his clinical interview and review of Lewis' medical records, Dr. Trueblood's diagnoses were as follows: posttraumatic stress disorder, major depression "mild, recurrent" panic disorder, mild generalized social phobia, cognitive disorder (provisional diagnosis), and alcohol abuse in full, sustained remission (Axis I); borderline personality characteristics (Axis

---

[6] Lewis' friend, Patricia Ottmar, also completed a third-party adult function report on January 25, 2011, which largely reflects the same information contained in Lewis' adult function report.

II); back injury, chronic pain, carpal tunnel syndrome, a hearing impairment, and allergies (Axis III); being unemployed, financial stress, coping with a recent relocation, being a single mother, mild social isolation, and estranged relationships with mother and brother (Axis IV); and a GAF score of 48.[7]

On June 4, 2011, Dr. Neal Berner ("Dr. Berner"), a non-examining state agency physician, completed a physical residual functional capacity assessment. Based on a review of the records only, Dr. Berner concluded that Lewis could lift and carry twenty pounds occasionally and ten pounds frequently; sit, stand, and walk for up to six hours during an eight-hour workday; push and/or pull in accordance with the lift and carry restriction; occasionally crawl, crouch, kneel, stoop, and climb ramps, stairs, ladders, ropes, and scaffolds; balance without limitation; occasionally reach overhead bilaterally; and handle (i.e., gross manipulation) on a limited basis with the left upper extremity. Dr. Berner also found that Lewis did not suffer from any visual, communicative, or environmental limitations.

On June 6, 2011, Dr. Bill Hennings ("Dr. Hennings"), a non-examining state agency psychologist, reviewed Lewis' records and completed a psychiatric review technique assessment. Dr. Hennings concluded that the limitations imposed by Lewis' impairments failed to satisfy listing 12.04 (affective disorders), listing 12.06 (anxiety disorders), or listing 12.09 (substance addition disorders).[8]

---

[7] A GAF of 48 indicates "serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 503 (6th Cir. 2006).

[8] The Listing of Impairments is found at 20 C.F.R. Pt. 404, Subpt. P, App. 1, and described at 20 C.F.R. §§ 404.1525, 404.1526, 416.925, 416.926.

That same day, June 6, 2011, Dr. Hennings also completed a mental residual functional capacity assessment, which described Lewis as moderately limited in three of sixteen categories of mental activity, and not significantly limited in thirteen. Dr. Hennings added that Lewis is capable of performing simple, routine tasks, but would have difficulty with detailed tasks on a consistent basis, and that Lewis should be limited to no more than occasional interaction with the public due to mood swings.

On October 7, 2011, Dr. Ugalde completed a function questionnaire, wherein she stated that Lewis can occasionally lift up to fifteen pounds and frequently lift up to five pounds, walk and stand for three hours in an eight-hour workday, and sit for up to eight hours in an eight-hour workday. (Tr. 1096-97.)

On October 13, 2011, Dr. Paul Rethinger ("Dr. Rethinger"), a non-examining state agency psychologist, reviewed Lewis' medical records and found no basis for altering the psychiatric review technique and mental residual function capacity assessments completed by Dr. Hennings on June 6, 2011.

Also on October 13, 2011, Dr. Martin Kehrli ("Dr. Kehrli"), a non-examining state agency physician, completed a second physical residual functional capacity assessment. Based on a review of the records only, Dr. Kehrli concluded that Lewis could lift and carry twenty pounds occasionally and ten pounds frequently; sit for up to six hours in an eight-hour workday; stand and walk for up to three hours in an eight-hour workday; push and/or pull in accordance with the lift and carry restriction; occasionally crawl, crouch, kneel, stoop, and climb ramps, stairs, ladders, ropes, and scaffolds; balance without limitation; occasionally reach overhead bilaterally; and handle on a

limited basis with the left upper extremity. Dr. Kehrli found no evidence of visual, communicative, or environmental limitations.

On February 16, 2012, Lewis visited Patricia Newman ("Newman"), a family nurse practitioner at Pine Meadows Family Health Care. Lewis expressed "concerns about the possibility of having" attention deficit hyperactivity disorder, and received a prescription for Adderall. (Tr. 1129.) During a follow-up visit, members of Lewis' family reported "big improvement" in Lewis' behavior. (Tr. 1128.)

On July 27, 2012, Lewis presented for a physical therapy wheelchair evaluation at St. Charles Medical Center. Eric Ballinger ("Ballinger"), a physical therapist, concluded that Lewis' degree of impairment warranted the use of a "wheelchair at this time for safe and independent mobility[.]" (Tr. 1206.)

On August 15, 2012, Lewis was examined by Dr. Nancy Maloney ("Dr. Maloney"). Based on her examination and review of Lewis' medical records, Dr. Maloney concluded that: (1) Lewis "has not been able, on a regular and sustain[ed] basis, to engage in sedentary, light or medium level work" since September of 2009, (2) Lewis' complaints are "reasonable and correlate with the objective findings on radiologic studies of cervical, lumbar regions and left hip," (3) Lewis' combination of impairments would result in three or more absences per month, and limit "her tolerance to prolonged postures, repetitive upper extremity activities in the seated position, [and] activities requiring sustained neck or trunk flexion," (4) Lewis "requires frequent change of position including [a] need to position horizontally as a rest break from pain," and (5) Lewis' limitations "in cervical and lumbar flexibility and muscular endurance . . . would preclude gainful employment." (Tr. 1162.)

Page 11 - FINDINGS AND RECOMMENDATION

Also on August 15, 2012, Dr. Maloney completed a Physical Residual Function Capacity Report. In her Physical Residual Function Capacity Report, Dr. Maloney opined that Lewis (1) could lift and carry ten pounds occasionally and less than ten pounds frequently; (2) could stand and walk for up to two hours in an eight-hour workday and sit for less than six hours in an eight-hour workday; (3) could push and pull in accordance with the lift and carry restrictions; (4) could occasionally reach, handle, finger, feel, balance, and stoop, but never kneel, crouch, crawl, or climb ramps, stairs, ladders, rope, or scaffolds; (5) needed to avoid all exposure to hazards (machinery, heights, etc.), occasional exposure to vibration, and frequent exposure to extreme cold or heat, wetness, humidity, and noise; and (6) has no restriction with respect to "[f]umes, odors, dusts, gases, poor ventilation, etc." (Tr. 1165.)

In a declaration dated May 7, 2013, Lewis' fiancé, Shawn Ottmar ("Ottmar"), stated that he does most of the cooking and cleaning around the house, and that Lewis needs assistance with a number of activities of daily living, including bathing, getting dressed, and transportation. Ottmar added that Lewis started using a wheelchair after the amended onset date, uses a walker inside the house, lies down approximately two to three times per day for up to ninety minutes, and has trouble using her hands. Ottmar also stated that Lewis "has actually improved since she stopped drinking and [got] on medications," but she is still forgetful (e.g., "leaving things on the stove cooking"), very depressed, easily irritable, and "does not have any friends beyond her caretaker [and family]." (Tr. 396.)

In a declaration dated May 8, 2013, Lewis' caregiver, Suzanne Blakely ("Blakely"), stated that she has served as Lewis' caregiver since October 2012; in April 2013, her hours were increased from twenty to sixty-seven per week due to Lewis' "very severe physical and emotional problems";

and Lewis needs help getting dressed, bathing, cleaning, cooking, moving and transferring positions, managing her medications, doing the laundry, shopping, monitoring her health status, and with transportation. (Tr. 398.) Blakely confirmed that Lewis uses a wheelchair outside of the home, and a walker inside.

On May 9, 2013, Migdol completed a Medical Source Statement, which asked Migdol to assess the degree of limitation Lewis experiences in twenty categories of mental activity. Migdol indicated that Lewis suffers from a Category IV level (precludes performance/productivity for thirty percent of an eight-hour workday) of impairment in sixteen categories of mental activity and a Category III level (precludes performance/productivity for twenty percent of an eight-hour workday) of impairment in four. Migdol added that Lewis has not been able to work since February 4, 2010, and Lewis' physical and mental impairments "clearly contribute to a marked inability to perform work duties." (Tr. 1203.)

On May 14, 2013, Newman completed a disability questionnaire prepared by Lewis' attorney. In the questionnaire, Newman opined that Lewis' impairments would cause her to be absent from work at least three days per month because she cannot "stand for any prolonged period." (Tr. 1195.) Newman added that Lewis cannot lift ten pounds or stoop, and that Lewis has a poor grip due to neuropathy.

An administrative law judge ("ALJ") convened a hearing on May 21, 2013, at which Lewis testified about the limitations resulting from her impairments. Lewis testified that she stopped working in March 2010; cannot stand or walk for more than "a couple of blocks" without using an assistive device; uses medical marijuana and a wheelchair whenever she leaves the house; has a caregiver who assists with bathing, cooking, and cleaning; received unemployment benefits from

Page 13 - FINDINGS AND RECOMMENDATION

"the beginning of 2011 . . . until early 2012," and lives with her fiancé and two teenage children. (Tr. 56, 66.) In terms of physical impairments, Lewis testified that she suffers most significantly from back and left hip impairments, as well as carpal tunnel syndrome in both wrists. Lewis added that her mental impairments have never prevented her from working, but they have worsened post-amended onset date.

The ALJ posed a hypothetical question to a vocational expert ("VE") who testified at Lewis' hearing. The ALJ asked the VE to assume that a hypothetical worker of Lewis' age, education, and work experience could perform sedentary work, subject to the following limitations: (1) she can perform only unskilled, repetitive, routine work; (2) she is left-hand dominant and can use her hands frequently; and (3) she requires a hand-held assistive device when standing or walking. The VE testified that the hypothetical worker could be employed as a final assembler and patcher. The VE further testified that there were 6,000 final assembler jobs available in the national economy, including 100 in Oregon, and 5,500 patcher jobs available in the national economy, including 75 in Oregon.

Lewis' attorney also posed a series of questions to the VE. Responding to Lewis' attorney's questions, the VE stated that the jobs of final assembler and patcher can involve frequent reaching, handling, and fingering; the need to lie down outside of customary break periods would preclude gainful employment; the use of a wheelchair would not necessarily prevent an individual from being employed as a final assembler or patcher, but accommodations from the employer would likely be needed; and an individual who could sit for only thirty minutes at a time or handle items on no more than an occasional basis would be unable to sustain employment as a final assembler or patcher. The VE added that a hypothetical worker could not be employed as a final assembler or patcher if she

suffered from significant deficits (i.e., "precludes performance-productivity for [thirty] percent of an eight-hour workday") in the ability to maintain attention and concentration for extended periods; perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerance; and complete a normal workday and workweek without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods. (Tr. 81.) Finally, the VE testified that employers typically tolerate no more than one absence per month, and an employee would be terminated if she was off-task for more than fifteen percent of the workday.

In a written decision issued on June 21, 2013, the ALJ applied the five-step evaluation process set forth in 20 C.F.R. §§ 404.1520(a)(4) and 416.920(a)(4), and found that Lewis was not disabled. *See infra* Part II.A-B. The Social Security Administration Appeals Council denied Lewis' petition for review, making the ALJ's decision the Commissioner's final decision. Lewis timely appealed.

## II. THE FIVE-STEP SEQUENTIAL PROCESS

### A.    Legal Standard

A claimant is considered disabled if he or she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A). "Social Security Regulations set out a five-step sequential process for determining whether an applicant is disabled within the meaning of the Social Security Act." *Keyser v. Comm'r Soc. Sec. Admin.*, 648 F.3d 721, 724 (9th Cir. 2011). Those five steps are as follows:

(1) Is the claimant presently working in a substantially gainful activity? (2) Is the claimant's impairment severe? (3) Does the impairment meet or equal [one of the listed impairments]? (4) Is the claimant able to perform any work that he or she has done in the past? and (5) Are there significant numbers of jobs in the national economy that the claimant can perform?

*Id.* at 724-25. The claimant bears the burden of proof for the first four steps in the process. *Bustamante v. Massanari*, 262 F.3d 949, 953-54 (9th Cir. 2001). If the claimant fails to meet the burden at any of the first four steps, the claimant is not disabled. *Id.*; *Bowen v. Yuckert*, 482 U.S. 137, 140-41 (1987).

The Commissioner bears the burden of proof at step five of the process, where the Commissioner must show the claimant can perform other work that exists in significant numbers in the national economy, "taking into consideration the claimant's residual functional capacity, age, education, and work experience." *Tackett v. Apfel*, 180 F.3d 1094, 1100 (9th Cir. 1999). If the Commissioner fails to meet this burden, the claimant is disabled. *Bustamante*, 262 F.3d at 954 (citations omitted).

**B.    The ALJ's Decision**

At the first step of the five-step sequential evaluation process, the ALJ found that Lewis had not engaged in substantial gainful activity since March 14, 2010, the amended alleged disability onset date. At the second step, the ALJ found that Lewis had the severe impairments of degenerative disc disease of the lumbar and cervical spine, left hip impingement and partial labral tearing, bilateral carpal tunnel syndrome, obesity, depressive mood disorder not otherwise specified, anxiety disorder not otherwise specified, personality disorder not otherwise specified, and polysubstance abuse and/or dependence.

At the third step, the ALJ found that Lewis' combination of impairments was not the equivalent of those on the Listing of Impairments. The ALJ then assessed Lewis' residual functional capacity ("RFC") and found that she could do "sedentary work," as defined under 20 C.F.R. §§ 404.1567(a) and 416.967(a), subject to the following limitations: (1) she must be able to use a hand-held assistive device when standing or walking during the workday, (2) she is able to use her hands on no more than a frequent basis, and (3) she is limited to performing unskilled, repetitive, and routine work.

At the fourth step, the ALJ concluded that Lewis was not capable of performing any past relevant work. At the fifth step, the ALJ concluded that there were other jobs existing in significant numbers in the national economy that Lewis could perform, such as a final assembler and patcher. Accordingly, the ALJ determined that Lewis was not disabled within the meaning of the Social Security Act.

### III. STANDARD OF REVIEW

The district court may set aside a denial of benefits only if the Commissioner's findings are "'not supported by substantial evidence or [are] based on legal error.'" *Bray v. Comm'r Soc. Sec. Admin.*, 554 F.3d 1219, 1222 (9th Cir. 2009) (quoting *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 882 (9th Cir. 2006)). Substantial evidence is defined as "'more than a mere scintilla [of evidence] but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.* (quoting *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995)).

The district court "cannot affirm the Commissioner's decision 'simply by isolating a specific quantum of supporting evidence.'" *Holohan v. Massanari*, 246 F.3d 1195, 1201 (9th Cir. 2001)

(quoting *Tackett*, 180 F.3d at 1097). Instead, the district court must consider the entire record, weighing both the evidence that supports the Commissioner's conclusions, and the evidence that detracts from those conclusions. *Id.* However, if the evidence as a whole can support more than one rational interpretation, the ALJ's decision must be upheld; the district court may not substitute its judgment for the judgment of the ALJ. *Bray*, 554 F.3d at 1222 (citing *Massachi v. Astrue*, 486 F.3d 1149, 1152 (9th Cir. 2007)).

## IV. DISCUSSION

In this appeal, Lewis argues that the ALJ erred by failing to: (1) offer legally sufficient reasons for discounting Dr. Maloney's opinion evidence; (2) offer clear and convincing reasons for discrediting Lewis' testimony; and (3) account for all of Lewis' credible limitations in formulating the RFC and VE hypothetical. As explained below, the Court finds that the ALJ erred in assigning less weight to Dr. Maloney's opinion, Lewis satisfies all three conditions of the credit-as-true rule, and a careful review of the record discloses no reason to seriously doubt that Lewis is, in fact, disabled. The Court therefore recommends that the district judge reverse and remand this case for an award of benefits.

### A.    Medical Opinion Evidence

#### 1.    Applicable Law

"There are three types of medical opinions in social security cases: those from treating physicians, examining physicians, and non-examining physicians." *Valentine v. Comm'r Soc. Sec. Admin.*, 574 F.3d 685, 692 (9th Cir. 2009) (citing *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995)). In the event "a treating or examining physician's opinion is contradicted by another doctor, the '[ALJ] must determine credibility and resolve the conflict.'" *Id.* (quoting *Thomas v. Barnhart*,

278 F.3d 947, 956-57 (9th Cir. 2001)). An ALJ may only reject a physician's "contradicted opinions

by providing 'specific and legitimate reasons that are supported by substantial evidence.'" *Ghanim*

*v. Colvin*, 763 F.3d 1154, 1161 (9th Cir. 2014) (quoting *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194,

1198 (9th Cir. 2008)).

"An ALJ can satisfy the 'substantial evidence' requirement by 'setting out a detailed and

thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof,

and making findings.'" *Garrison v. Colvin*, 759 F.3d 995, 1012 (9th Cir. 2014) (quoting *Reddick v.*

*Chater*, 157 F.3d 715, 725 (9th Cir. 1998)). Merely stating conclusions, however, is insufficient:

"The ALJ must do more than state conclusions. He must set forth his own interpretations and explain

why they, rather than the doctors', are correct." *Id.* "[A]n ALJ errs when he rejects a medical opinion

or assigns it little weight while doing nothing more than ignoring it, asserting without explanation

that another medical opinion is more persuasive, or criticizing it with boilerplate language that fails

to offer a substantive basis for his conclusion." *Id.* at 1012-13 (citing *Nguyen v. Chater*, 100 F.3d

1462, 1464 (9th Cir. 1996)).

### 2.    Application of Law to Fact

Lewis maintains that the ALJ failed to offer legally sufficient reasons for discounting Dr.

Maloney's opinions, in particular her opinion that Lewis could not sustain gainful employment. The

Court agrees.

Dr. Maloney's medical opinions dated August 15, 2012, conflict with the opinions of the

non-examining state agency medical consultants, none of whom opined that Lewis' impairments

would preclude gainful employment. Thus, the ALJ was required to provide specific and legitimate

reasons for discrediting Dr. Maloney's opinions that are supported by substantial evidence in the

Page 19 - FINDINGS AND RECOMMENDATION

record. *See Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1195 (9th Cir. 2004) ("[I]n the case of a conflict 'the ALJ must give specific, legitimate reasons for disregarding the opinion of the treating physician.'"); *Killan v. Barnhart*, 226 F. App'x 666, 668 (9th Cir. 2007) ("Killian's contention that the ALJ erred when he discounted her treating physician's opinion is flawed because the treating physician's opinion conflicted with that of a nonexamining physician, and the ALJ supported his decision with specific and legitimate reasons."). The Court finds that the ALJ failed to do so.

The ALJ discounted Dr. Maloney's opinions because they were based largely on Lewis' self-reports, which the ALJ found not credible. It is well settled that an ALJ may reject a doctor's opinion "if it is based to a large extent on a claimant's self-reports that have been properly discounted as incredible." *Burrell v. Colvin*, 775 F.3d 1133, 1141 (9th Cir. 2014) (quoting *Tommasetti v. Astrue*, 533 F.3d 1035, 1041 (9th Cir. 2008)). "However, when an opinion is not more heavily based on a patient's self-reports than on [the doctor's] clinical observations, there is no evidentiary basis for rejecting the opinion." *Ghanim*, 763 F.3d at 1162 (citing *Ryan*, 528 F.3d at 1199-1200). Such is the case here.

In addition to conducting a comprehensive physical evaluation, Dr. Maloney reviewed the following records before issuing her opinions: (1) a function questionnaire completed by Dr. Ugalde on October 7, 2011; (2) medical records issued by Drs. Ugalde and Bollom between September 21, 2009, and May 8, 2012; (3) medical records issued by Newman between May 2009 and May 2012; (4) medical records from the St. Charles Medical Center dated December 2010 to December 2011; (5) the psychodiagnostic examination report prepared by Dr. Trueblood on May 10, 2011; (6) an adult function report and pain and fatigue questionnaire prepared by Lewis; and (7) a third-party

function report prepared by Lewis' friend, Patricia Ottmar, on January 25, 2011. (Tr. 1156.) While Dr. Maloney makes some reference to reports from Lewis, she focuses primarily on the results of the examination and past x-rays, MRIs, and CT scans. (*See* Tr. 1156-1163.) Dr. Maloney appears to have addressed Lewis' self-reports largely because it was necessary to respond to questions posed by the referring agency. (*See* Tr. 1162.) The ALJ offered no basis for his conclusion that Dr. Maloney's opinions were based heavily on Lewis' self-reports (*see* Tr. 28; Def.'s Br. at 13), and substantial evidence does not support such a conclusion. *See Ghanim*, 763 F.3d at 1162 (making the same observation).

The ALJ also discounted Dr. Maloney's opinions because they conflicted with Lewis' daily activities. Such a conflict may justify rejecting a doctor's opinion. *See Morgan v. Comm'r of Soc. Sec. Admin.*, 169 F.3d 595, 600-02 (9th Cir. 1999) (finding an inconsistency between a doctor's opinion and a claimant's daily activities a specific and legitimate reason to discount the doctor's opinion). Here, however, a holistic review of the record does not reveal an inconsistency between Dr. Maloney's opinions and Lewis' activities. *See Ghanim*, 763 F.3d at 1162 (explaining that the record must be read holistically when assessing whether a claimant's activities are inconsistent with a doctor's opinion).

Specifically, the ALJ discounted Dr. Maloney's opinion because Lewis worked at a medium exertional level before the amended onset date, currently lives with her teenage children (who were in foster care for a period of time), completed some college coursework, and attends AA meetings. The ALJ found these activities to be inconsistent with Dr. Maloney's opinion, as they were indicative of an ability to "tolerate sitting for prolonged periods, with occasional periods of standing or walking." (Tr. 29.) Nothing in the record, however, forecloses the possibility that Lewis frequently

Page 21 - FINDINGS AND RECOMMENDATION

changed from a standing to sitting to horizontal position while living with her children, completing her college coursework, and attending AA meetings. Further, the record indicates that Lewis was not able to return to work on a regular and sustained basis after suffering an on-the-job injury in September of 2009. These observations suggest that Lewis' activities are not inconsistent with the opinion of Dr. Maloney, who opined as follows: "Since September of 2009, on a more probable basis than not, [Lewis] has not been able, on a regular and sustain[ed] basis, to engage in sedentary, light or medium level work. Pain limits [Lewis'] ability to sit for prolonged periods of time without frequent change of position." (Tr. 1162.) Further corroborating Dr. Maloney's opinion is the fact that Lewis has a personal caregiver, who works up to sixty-seven hours per week and testified that Lewis needs help getting dressed, bathing, cleaning, cooking, and moving and transferring positions. Lewis' limited activities are consistent with Dr. Maloney's opinions. *See also Ghanim*, 763 F.3d at 1162 ("A claimant need not be completely incapacitated to receive benefits.")

The ALJ also rejected Dr. Maloney's opinions because they were inconsistent with her own examination notes, which is a valid reason for rejecting a doctor's opinion. *See Valentine*, 574 F.3d at 692-93 (holding that a conflict with treatment notes is a specific and legitimate reason to reject a doctor's opinion). The purported inconsistency here concerned Dr. Maloney's conclusion that Lewis would occasionally experience manipulative limitations (reaching, handling, fingering, and feeling). By contrast, Dr. Maloney's examination notes state that Lewis was "able to reach without difficulty," that there was "no impairment within bilateral upper . . . extremity movement," and that Lewis was able "to hold, grasp, grip, rotate and pinch items within hands." (Tr. 1161.) However, Dr. Maloney's examination notes also state that a muscle test revealed less than full strength "throughout bilateral upper . . . extremities proximally through distally," Lewis was "unable to perform rapid

Page 22 - FINDINGS AND RECOMMENDATION

alternating movements," Lewis was only able "to slowly oppose thumb to each digit" and "slowly

manipulate small and large items within hands," Lewis has "chronic myalgia" within her limbs, and

Lewis' pain "limits her tolerance to . . . repetitive upper extremity activities in the seated position[.]"

(Tr. 1161-63.) These latter observations are consistent with Dr. Maloney's opinions, because they

suggest that Lewis would in fact experience occasional manipulative limitations, as manifested by

difficulties in performing repetitive and alternating movements due to pain and deficits in hand speed

and strength. *Cf. Angelonis v. Colvin*, No. 14-cv-05863, 2015 WL 3743290, at *4 (W.D. Wash. June

15, 2015) (stating that the "alleged discrepancies" between a doctor's opinion and his examination

findings were "not true inconsistencies" because they could be reconciled, and thus holding that the

"ALJ's finding of an internal inconsistency" was not supported by substantial evidence in the

record). Moreover, the ALJ himself determined that Lewis' "limited ability to . . . use her hands

consistently is supported by her recent medical findings," yet he rejected Dr. Maloney's analogous

opinion and formulated an RFC for an individual who could use her hands "on a frequent basis." (Tr.

17, 26.)

     For these reasons, the Court concludes that, in rejecting Dr. Maloney's opinion evidence, the

ALJ failed to provide specific and legitimate reasons that were supported by substantial evidence in

the record. *See Garrison*, 759 F.3d at 1013 (agreeing with the district court that the ALJ failed to

offer specific and legitimate reasons supported by substantial evidence for rejecting the testimony

of two doctors, where the ALJ committed a number of significant errors in evaluating the doctors'

opinions).[9]

---

     [9] The ALJ also seemed to reject Dr. Maloney's opinions to the extent they were inconsistent
with the ALJ's own interpretation of past x-rays and MRIs. (*Compare* Tr. 28, *with* Tr. 1158, *and* Tr.
1161-62.) While the errors described above are sufficient to conclude that the ALJ committed

## B.    Remedy

In a number of Social Security cases, the Ninth Circuit has "stated or implied that it would be an abuse of discretion for a district court not to remand for an award of benefits when [three] conditions are met." *Garrison*, 759 F.3d at 1020 (citations omitted). Specifically, a district court should reverse and remand for an award of benefits when the following "credit-as-true" criteria are met:

> (1) the record has been fully developed and further administrative proceedings would serve no useful purpose; (2) the ALJ has failed to provide legally sufficient reasons for rejecting evidence, whether claimant testimony or medical opinion; and (3) if the improperly discredited evidence were credited as true, the ALJ would be required to find the claimant disabled on remand.

*Id*. Even when these "credit-as-true" criteria are satisfied, however, district courts in this circuit retain the "flexibility to remand for further proceedings when the record as a whole creates serious doubt as to whether the claimant is, in fact, disabled within the meaning of the Social Security Act." *Id*.

In this case, the ALJ failed to provide legally sufficient reasons for rejecting Dr. Maloney's medical opinion evidence. Dr. Maloney opined that the combination of Lewis' "orthopedic medical impairments would result in absenteeism of [three] or more days per month," which exceeds the customary tolerance for absences in the jobs of final assembler and patcher. (Tr. 88, 1163.) Thus, if Dr. Maloney's opinion was credited as true, the ALJ would be required to find Lewis disabled on remand.

---

harmful error in evaluating Dr. Maloney's opinions, the Court notes that an "ALJ may not substitute [his] opinion for that of medical doctor." *Walston v. Astrue*, 11-00145, 2012 WL 5258784, at *7 (E.D. Wash. Oct. 24, 2012); *see also Rohan v. Chater*, 98 F.3d 966, 970 (7th Cir. 1996) (explaining that "ALJs must not succumb to the temptation to play doctor and make their own independent medical findings.")

The Commissioner contends that further proceedings are "necessary to resolve conflicts and ambiguities." (Def.'s Br. at 16.) In support of her argument, the Commissioner (1) notes that the ALJ gave more weight to the opinions of Drs. Ugalde and Kehrli, and "some weight" to certain unnamed non-examining state agency medical consultants; and (2) states in a conclusory fashion that the opinions of unnamed sources raise serious doubt as to whether Lewis is, in fact, disabled. (*See* Def.'s Br. at 16-17.) In effect, "the Commissioner asks the Court to remand so the ALJ can have a second chance to evaluate the erroneously discounted evidence." *Quinnin v. Colvin*, No. 12-01133-SI, 2013 WL 3333026, at *5 (D. Or. July 1, 2013) (citation omitted). However, "[a]llowing the Commissioner to decide the issue again would create an unfair 'heads we win; tails, let's play again' system of disability benefits adjudication." *Benecke v. Barnhart*, 379 F.3d 587, 595 (9th Cir. 2004) (citation omitted).

Furthermore, the Commissioner fails to point to any medical opinion evidence that explicitly contradicts Dr. Maloney August 15, 2012 opinion on absenteeism. That is significant because Newman completed a disability questionnaire on May 14, 2013, which also found that Lewis' impairments would cause her to be absent from work at least three days per month. (Tr. 1195.) In light of the foregoing, no further issues must be resolved before a disability determination can be made. *See Flowers v. Colvin*, No. 15-1591-SB, 2016 WL 807693, at *11 (D. Or. Feb. 11, 2016) (reversing and remanding for an award of benefits where the improperly discredited medical evidence included an opinion on absenteeism, and the VE testified that the estimated number of absences would preclude gainful employment).[10]

---

[10] Consistent with the above findings, the Court agrees with Lewis that the VE "hypothetical did not include assessed limitations established in the record." (Pl.'s Opening Br. at 20.) The Court need not reach the issue of whether the ALJ provided sufficient reasons for finding Lewis' testimony

## V. CONCLUSION

For the reasons stated, the district judge should reverse and remand this case for an award of benefits.

## VI. SCHEDULING ORDER

The Findings and Recommendation will be referred to a district judge. Objections, if any, are due fourteen (14) days from service of the Findings and Recommendation. If no objections are filed, the Findings and Recommendation will go under advisement on that date. If objections are filed, a response is due fourteen (14) days after being served with a copy of the objections. When the response is due or filed, whichever date is earlier, the Findings and Recommendation will go under advisement.

Dated this 29th day of June, 2016.

_____
STACIE F. BECKERMAN
United States Magistrate Judge

_____

not credible.

Page 26 - FINDINGS AND RECOMMENDATION